UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                    CIVIL ACTION NO. 17-cr-00138

VERSUS                                      JUDGE FOOTE

THOMAS G. TAYLOR (01)                       MAGISTRATE JUDGE HORNSBY
TINA LOUISE TAYLOR (02)
MICHAEL SHANE RUSHTON (03)
DONNIE VANCE GRABENER (04)


**REPORT AND RECOMMENDATION**

**Introduction**

Defendants Thomas G. Taylor ("Thomas"), Tina Louise Taylor ("Tina"), Michael

Rushton ("Rushton"), and Donnie Grabener ("Grabener") are charged with conspiracy to

distribute methamphetamine.  Doc. 27 (Count 1).  Thomas and Tina are also charged with

possession with intent to distribute methamphetamine. Count 2.  Grabener is charged with

being a felon in possession of a firearm.  Count 3.  The charges arise out of a narcotics

investigation that led to a traffic stop in rural Caddo Parish.

Before the court are:  Motion to Suppress filed by Tina (Doc. 54); Motion to Suppress

filed by Thomas (Doc. 58); and Motions to Adopt Motions of Other Defendants filed by

Grabener and Rushton (Docs. 59 and 61).  The court allowed Grabener and Rushton to adopt

the motions to suppress filed by Tina and Thomas, but required that Grabener and Rushton

each file a brief explaining how they have standing to challenge the traffic stop and any

statements made thereafter.  Grabener, who was not in the vehicle at the time of the stop, did

not file a brief on standing.  Rushton, who was the driver of the vehicle, filed his brief on standing.  Doc. 64.  For the reasons that follow, it is recommended that the motions to suppress be denied.

**Facts**

An evidentiary hearing was held on September 19, 2017.  The evidence at the hearing establishes the following facts.   DEA Task Force Officer Rick Anderson received information from two confidential informants that Grabener was selling multi-ounce quantities of methamphetamine in the Shreveport-Bossier area.  Tr. 46-47.  With the help of the confidential informants and surveillance activities, Agent Anderson learned that Grabener's source of supply, known only as Thomas and Tina, were living in a Motel 6 in Shreveport.  Tr. 47.

Anderson sent an informant to meet with Grabener in an attempt to determine the full identities of Thomas and Tina.  Tr. 48.  The informant told Anderson that the hotel room contained approximately one ounce of methamphetamine, and that Thomas and Tina were attempting to sell that ounce so they could travel back to their source of supply in Texas to obtain additional methamphetamine.  Id.  However, Thomas and Tina did not have a vehicle to make the trip.  Anderson instructed the informant, who was in the business of buying and selling vehicles, to offer to sell a vehicle to Thomas and Tina.  Tr. 49.  Thomas and Tina eventually paid $5,000 to the informant for a 2010 Nissan Titan.  Id.

Once the agreement was made to purchase the vehicle, the informant drove the Nissan to a shop to have the brake lights repaired.  Meanwhile, Agent Anderson obtained a search

warrant from a state court judge authorizing the installation and use of a tracking device on the Nissan. Tr. 68. After the Nissan's brake lights were repaired, and at the direction of Agent Anderson, the informant stopped by Anderson's office. Anderson installed the tracking device on the Nissan, and the informant delivered the Nissan to Thomas and Tina.

The next day, Agent Anderson monitored the tracking device and saw the vehicle traveling towards Dallas, Texas. The vehicle stopped at an address in Mesquite, Texas, stayed there for several hours, then drove to Deberry, Texas. Agent Anderson then tracked the vehicle as it traveled north on Highway 79 from Texas back into Caddo Parish, Louisiana. Tr. 50.

At approximately 2:00 a.m., Agent Anderson contacted Deputy Fernandez Graham, who was working night patrol for the Caddo Parish Sheriff's Office in the area of I-20 and Greenwood, Louisiana. Tr. 17. Anderson told Graham that a Nissan Titan was traveling north on Highway 79 from Texas into Caddo Parish and that it may be carrying a large amount of methamphetamine. Id. Anderson asked Graham to stop the vehicle if Graham saw a traffic violation.

Deputy Graham parked his patrol vehicle at the "Lick Skillet" in Bethany, Louisiana just on the Louisiana side of the Louisiana/Texas border. Tr. 35. Graham saw the vehicle at approximately 3:50 a.m., and he began to follow it. As he was following the vehicle, he noticed that the license plate light was not working. Tr. 8, 38-39, 44. He also saw the vehicle cross the centerline twice. Tr. 8.

Deputy Graham did not activate his emergency lights immediately. The traffic violations occurred on a very rural and wooded stretch of highway without street lights. Deputy Graham followed the vehicle northbound until the vehicle approached the "Relay Station," a gas station/video poker casino. Tr. 9, 37-38. Deputy Graham testified that the area along Highway 79 is "really dark," and he wanted to stop the vehicle in a lighted area for officer safety. Tr. 27, 38. Once Deputy Graham activated his emergency lights, the vehicle came to a stop across the highway from the Relay Station.

After the Nissan came to a stop, Deputy Graham exited his patrol car and approached the driver side window of the Nissan. The video recording shows that when Deputy Graham began to identify himself and the purpose of the stop, the driver, later determined to be Rushton, interrupted Graham and stated that he knew he had been pulled over because there was a problem with his taillights. Tr. 12. Rushton stated that he had just obtained the vehicle, that he was not used to driving it, and that the power steering was messed up. Tr. 14, 23. Rushton also said something about being followed by a friend in another vehicle.

There were three occupants in the Nissan. Rushton was driving, Thomas was in the passenger seat, and Tina was in the back seat. Deputy Graham asked them to exit the vehicle. Deputy Graham ran a warrants check and determined that Tina had a warrant for a parole violation in Texas. Tina was immediately placed under arrest pursuant to that warrant. Tr. 19.

Deputy Graham asked the remaining two occupants who owned the vehicle. Tr. 20. Thomas stated that the vehicle belonged to him and that he had just purchased it a few days

ago. Tr. 21. Deputy Graham asked Thomas for consent to search the vehicle, and Thomas granted oral consent. Tr. 20. Deputy Graham began his search in the back seat area, where he located a cardboard box containing a large quantity of methamphetamine. Tr. 21. Thomas and Rushton were arrested.

Deputy Graham contacted Agent Anderson, who had arrived at the Relay Station as the traffic stop was underway and was watching the scene unfold through his binoculars. Anderson and two other Task Force agents appeared on the scene shortly thereafter. Tr. 22, 51. At that point, Anderson took control of the investigation.

Agent Anderson initially spoke to Rushton. Agent Anderson provided Miranda warnings to Rushton, and Rushton agreed to talk. Tr. 52. Rushton stated that he was driving Thomas and Tina from his house in DeBerry, Texas to Shreveport because Thomas did not have a valid driver's license. Rushton initially denied knowing that methamphetamine was in the vehicle. After he was transported from the scene to the Task Force office for processing, however, Rushton stated that he initially thought he was driving Thomas and Tina to Mesquite, Texas so they could pay a prior drug debt. At some point during the visit to the home in Mesquite, Texas, however, Rushton realized that it changed from paying a prior drug debt to the purchase of methamphetamine. Tr. 53.

Rushton also stated that once he, Thomas, and Tina left Mesquite, they drove to Rushton's house in DeBerry, where he assisted Thomas in removing the methamphetamine from a concealed location inside the Nissan's headliner and placing the methamphetamine on the center console. Tr. 53.

Thomas also agreed to speak with Agent Anderson following <u>Miranda</u> warnings.  Tr. 54.  Thomas stated that he and Tina had traveled to Mesquite to meet their source of supply and buy one kilogram of methamphetamine for $12,000.  Thomas told Agent Anderson that Tina was in charge of the money aspect of the organization.  <u>Id</u>.

**Defendants' Motions to Suppress**

Defendants make two arguments in favor of suppression: First, they argue that there were no grounds for Deputy Graham to make the traffic stop on the Nissan.  Second, they argue that the state court tracking warrant obtained by Agent Anderson is invalid because (a) it was not authorized by a federal judge and (b) it does not comply with the requirements of Rule 41.

**Law and Analysis**

**A.  Grabener's Standing**

The Government argues that defendant Grabener lacks standing to challenge the traffic stop and search because he was not the driver or a passenger in the Nissan at the time it was stopped.  The Government is correct.  Fourth Amendment rights are personal rights that may not be vicariously asserted by a co-defendant.  <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969).  At the time the vehicle was stopped, the only occupants were Rushton, Thomas, and Tina.  Accordingly, Grabener does not have standing to challenge the traffic stop.  <u>Rakas v. Illinois</u>, 439 U.S. 128, 132-45 (1978); <u>United States v. Short</u>, 181 F.3d 620, 623 (5th Cir. 1999).

**B.  The Traffic Stop**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, [courts] determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

Defendants challenge only the first Terry prong, i.e., whether Deputy Graham was justified in making the traffic stop in the first place. For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Lawful cause to make a traffic stop exists when a defendant commits a traffic violation and a law enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

Terry's first prong is met in this case. Deputy Graham began to follow the Nissan as soon as it crossed the state line into Louisiana. He immediately noticed that the Nissan's license plate was not illuminated, which is a violation of La. R.S. 32:304(C). Deputy

Graham also saw the Nissan swerve twice across the center line, which was in violation of La. R.S. 32:79.

Defendants argue that the dash cam video does not show the traffic violations, even though the recording began 20-30 seconds before Deputy Graham activated his emergency lights to initiate the stop. This argument overlooks Deputy Graham's credible testimony that the violations occurred in a "really dark" area of Highway 79 and that—for officer safety—he waited to make the stop until the Nissan was approaching the Relay Station where there was some nearby lighting.

Defendants also argue that the stop was pretextual. However, the stop was lawful even if Deputy Graham's subjective reason for the stop was to look for evidence of other crimes. "Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). The legal justification for the stop must simply be "objectively grounded." Id. The evidence establishes objective grounds for this stop.

**Validity of the Tracking Warrant**

Defendants argue that the state court tracking warrant is invalid because it was not signed by a federal judge and does not comply with Rule 41. They also argue that a state judge lacks authority to authorize a tracking warrant to track a vehicle across state lines. This court previously rejected these arguments in United States v. Guerra, 2017 WL 2486369 (W.D. La.), adopted, 2017 WL 249004 (W.D. La. 2017).

Rule 41 authorizes federal judges to sign warrants based on probable cause regarding violations of federal law. If a federal judge is not reasonably available, a state court judge may issue the warrant. However, nothing in Rule 41 prohibits a state police officer from obtaining a warrant for a state law violation from a state court judge.

Agent Anderson is an employee of the Caddo Parish Sheriff's Office. Because of his dual role as a deputy and a DEA task force officer, he had two options he could pursue when seeking the tracking warrant. Anderson could have applied for a search warrant from a state court judge for violations of state law—which he did—or he could have applied to a federal court for violations of federal law. Possessing and distributing methamphetamine are violations of both state and federal law. Therefore, in Anderson's dual capacity as a deputy and a task force officer, he could apply for either a state or a federal warrant.

The choice of obtaining the warrant in state court based on violations of state law does not render the warrant invalid simply because the evidence discovered may be later used in a federal case. From a practical standpoint, during the early stages of a drug investigation, it is difficult to know whether a case will be a state case or a federal case. Here, there is no indication whatsoever that Anderson manipulated the state court or was trying to avoid presenting the warrant to a federal judge. In fact, Anderson has presented this court with many warrants over the last several years.

Anderson testified that he did not know at the time the warrant was signed whether the case would be a state case or a federal case. According to Anderson:

Page 9 of  12

> [P]redominantly all of my cases are state cases because sometimes they don't meet the requirements of federal prosecution. So at this particular point when we found the kilo of meth in the car, my protocol is to contact the U.S. Attorney's office and see if they want to prosecute the case or not. If they decline, it's a state case.

Tr. 71-72.

Defendants' other arguments regarding the requirements of Rule 41 are not persuasive. Generally, Rule 41 only applies to warrants issued at the request of a federal officer. United States v. McKeever, 905 F.2d 829, 833 (5th Cir. 1990); United States v. Strahan, 2007 WL 2088610 (W.D. La.)(Hicks, J.)("Such is the rule even if federal officers may have participated in the search [executed pursuant to the state search warrant] and the evidence obtained from the search was offered in a federal prosecution.").

This was a state court tracking warrant issued in connection with the investigation of a violation of state law. The investigation itself was brand new. Thus, the warrant was not obtained from a state court judge during an on-going federal investigation. Under the circumstances of this case, the procedural requirements of Rule 41 do not apply.

Of course, the state court tracking warrant must still comply with federal constitutional protections. Here, there are no constitutional infirmities in the warrant. It is supported by probable cause, it specifically identified the vehicle to be tracked, and it limited the duration of the tracking to a reasonable time (45 days).

Defendants cite United States v. Lambus, 2017 WL 1745495 (E.D. N.Y.) for the proposition that only a federal judge is authorized to issue a warrant for a tracking device under Rule 41. But, in that case, no warrant was ever obtained. Instead, state parole

authorities placed a device on the defendant for over two years under the pretext that it was being used to ensure compliance with a curfew.  However, information from the device was exclusively used by federal authorities conducting a drug investigation.  That unique case provides no support for Defendants' argument here.

Defendants also cite the Advisory Committee Notes to Rule 41(b)(4), where the committee stated that because tracking may involve more than one district or state, only federal judicial officers should be authorized to issue this type of warrant.  However, Agent Anderson obtained the state court warrant in his capacity as a task force officer employed by the Caddo Parish Sheriff.  As explained above, the investigation into Grabener's drug trafficking had just begun, and Anderson did not yet know that the case would be a federal case.  There is no indication that Anderson was forum or judge shopping; that he was trying to avoid the requirements of Rule 41; or that he acted in bad faith in seeking the warrant from a state court judge. See United States v. Collier, 2017 WL 4681809 (E.D. Mich.)(denying motion to suppress on similar grounds).

**Conclusion**

The traffic stop was supported by probable cause that the Nissan did not have a properly illuminated license plate and that it crossed the center line of the highway.  The state court warrant was properly issued by a state court judge and, under the circumstances of this case, did not violate the requirements of Rule 41.

Accordingly;

IT IS RECOMMENDED that Defendants' Motions to Suppress be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 11th day of December, 2017.

Mark L. Hornsby
U.S. Magistrate Judge